# EXHIBIT A

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON          8/12/2025
By      /s/ Anthony Berini
                    Deputy Clerk

1  John A. Bruegger, Esq. (SBN: 250494)

2  jbruegger@parawolf.com
   **PARAFINCZUK WOLF, P.A.**

3  5550 Glades Road, Suite 500
   Boca Raton, FL 33431

4  Telephone: (954) 462-6700
   Fax: (954) 462-6567

5
   *Attorneys for Plaintiffs*

6

7

8

9

10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                    **FOR THE COUNTY OF SAN MATEO**

13  SUMEKA CHANDLER, an individual; and DT,        CASE NO.        25-CIV-06064
    a minor by and through his Guardian ad Litem,
14  SUMEKA CHANDLER,

15          Plaintiffs,                            **COMPLAINT FOR DAMAGES**

16      v.                                          **DEMAND FOR JURY TRIAL**

17                                                  1.  **Strict Product Liability – Design Defect**
    EPIC GAMES, INC.; MICROSOFT CORP.;             2.  **Strict Product Liability – Failure to**
18  MOJANG STUDIOS; ROBLOX                              **Warn**
    CORPORATION; and DOES 1 through 50             3.  **Negligence – Design**
19  inclusive,                                      4.  **Negligence – Failure to Warn**
                                                    5.  **Common Law Negligence**
20          Defendants.                             6.  **Statutory Negligence**
                                                    7.  **Intentional Misrepresentation**
21                                                  8.  **Negligent Misrepresentation**
                                                    9.  **Fraud**
22                                                  10. **Violations Of California's Unfair**
                                                        **Competition Law (Cal. Bus. & Prof.**
23                                                      **Code, §§ 17200 Et Seq.)**

24

25

26

27

28

Plaintiff minor DT, via their Guardian ad Litem Plaintiff Sumeka Chandler, hereby brings this action against Defendants Epic Games, Inc.; Microsoft Corp.; Mojang Studios; Roblox Corporation; and Does 1-50, (hereinafter collectively referred to as "Defendants"), to recover damages, pursuant to and under the laws of the State of California, arising from the severe injuries sustained because of DT's use of Defendants' products. In support thereof, Plaintiff alleges and states:

## INTRODUCTION

1.     Many modern video games are fun and engaging adventures that allow individuals to immerse themselves in the world of games. This litigation is not a war on fun. Nor does it seek to curtail the creation and enjoyment of entertaining video games. Rather, this litigation seeks to hold Defendants accountable for failing to warn and failing to include available safeguards against the known risks to minors associated with excessive use of their video game products and platforms (hereinafter collectively referred to as "Products") and choosing instead to implement programming that exacerbated these risks, to the detriment of minors like Plaintiff DT, to increase their profits.

2.     Defendants are aware that the more time an individual spends playing their respective games, the higher the likelihood that said individuals will make in-game purchases, thereby increasing Defendants' revenues.

3.     Defendants are also aware that for more than four decades scientists have known about and studied video game addiction.[1] Furthermore, Defendants are aware that for nearly two decades, science has shown that prolonged use of video games by minors can result in brain damage, cognitive decline, and physical and emotional deficits.

4.     Despite being fully aware of these risks, Defendants marketed their respective games, Fortnite, Minecraft, and Roblox through platforms provided to minors without implementing simple safety features, such as adequate parental controls, warnings, or opt-in limits on time minors can spend in-game.

5.     Instead, Defendants chose to add features to their games that they knew would be

---

[1] MD Griffiths; Halley de Oliveira Miguel Pontes, *A History and Overview of Video Game Addiction*, The Oxford Handbook of Digital Technologies and Mental Health (Oct. 8, 2020), https://doi.org/10.1093/oxfordhb/9780190218058.013.2.

addictive to minors in order to maximize time spent by minors like Plaintiff DT in their respective games, thus improving the odds of minors making in-game purchases, and thereby increasing Defendants' profits. Rather than taking necessary steps to mitigate the known risks associated with prolonged exposure of minors to video games, Defendants intensified the problem by causing and profiting from youth addiction.[2]

6.    Defendants' strategies have been extremely lucrative. As a result of Defendants' inclusion of addictive features in their respective games, they have collectively generated billions of dollars, while causing and/or contributing to a public health crisis for minors suffering from addiction to and disordered use of video games.

7.    While there are countless video games on the market, many with similar game design and warning failures described herein, Defendants and their respective games Fortnite, Minecraft, and Roblox have unique impacts on minors. As explained below, Defendants' marketing strategies specifically target youth. Accordingly, Defendants' games – Fortnite, Minecraft, and Roblox – are often among the first online video games children play and the catalyst to an addiction cycle and disordered relationship with video games.

8.    As set forth below, because of Defendants' marketing efforts, Fortnite, Minecraft, and Roblox were among the first online video games played by Plaintiff DT. As Defendants expected and intended from their decision to add addictive and manipulative programming to their Products instead of safety features, DT became addicted to Fortnite, Minecraft, and Roblox and developed a disordered relationship with video games. As a result, DT became addicted to these games and suffers from severe emotional distress, anxiety, depression, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, including attempted suicide. Through this lawsuit, DT seeks to hold Defendants accountable for their decisions to place profits over

---

[2] Addiction, as defined in the seminal article "Addictive Behaviors: Etiology and Treatment," published by the American Psychological Association in its 1988 *Annual Review of Psychology*, is: "a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate."

safety, which directly and proximately resulted in DT's significant harm.

9.      The true names and capacities of the Defendants, Does 1-50, are unknown to Plaintiffs at the time of filing this Complaint and Plaintiffs, therefore, sue said Defendants by fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been determined. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named Defendants are responsible in some manner for the occurrences alleged herein, and that Plaintiff's injuries and damage as alleged and set forth herein were proximately caused by such fictitiously named Defendants.

## **PARTIES**

**I.    Plaintiffs**

1.      Plaintiff Sumeka Chandler is, and at all times relevant to this action was, a citizen and resident of the State of Illinois whose principal place of residence is Will County.

2.      Plaintiff Sumeka Chandler is the mother of DT, a minor, and she serves as DT's Guardian ad Litem and representative in this lawsuit.

3.      Plaintiff DT, a minor, is, and at all times relevant to this action was, a citizen and resident of the State of Illinois with a principal place of residence located in Will County. DT is ten (10) years old at the time of filing this lawsuit.

4.      DT began playing video games and using Defendants' Products at approximately six (6) years old. Since that time, DT has used and/or continues to use Defendants' Products at an increasing, uncontrollable, compulsive, and/or addictive pace. DT has been injured and damaged, and continues to be injured and damaged, as a result of DT's use of, and addiction caused by DT's use of, Defendants' defective Products.

**II.    Defendants**

**Defendant Epic Games, Inc.**

5.      Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

6.      Epic Games is a video game developer and publisher who, at all times material hereto,

designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform, either directly or indirectly, to members of the general public within the State of California and the State of Illinois, including to DT.

**Defendant Mojang Studios**

7.    Defendant Mojang Studios is Swedish Company with its principal place of business in Stockholm, Sweden.

8.    At all times material hereto, Mojang Studios developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Minecraft series, either directly or indirectly, to members of the general public within the State of California and State of Illinois, including to DT.

**Defendant Microsoft Corporation**

9.    Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052.

10.    Microsoft and Mojang Studios acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Minecraft series with all the addictive features and technologies contained therein.

11.    In September 2014, Microsoft acquired Mojang Studios and the Minecraft intellectual property for $2.5 billion.[3] This acquisition has no impact on Mojang Studio's liability for the harm it caused Plaintiffs, and Microsoft is responsible for any damages that may be assessed against Mojang Studios.

**Defendant Roblox Corporation**

12.    Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, California 94403.

13.    Roblox Corp. is a video game developer and publisher who, at all times material hereto,

---

[3] See Minecraft is Now Part of Microsoft, and it Only Cost $2.5 Billion, TIME, https://time.com/3377886/microsoft-buys-mojang/ (Sept. 15, 2014).

designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video game and platform, Roblox, either directly or indirectly, to members of the general public within the State of California and State of Illinois, including to DT.

**Defendants Acted in Concert**

14.     Upon information and belief, each Defendant was aware—or should have been aware—that other game developers and publishers, including the other Defendants named herein, were engaging in the same behavior.

15.     Upon information and belief, Defendants all acted in concert and entered into licensing agreements to utilize the same patents to keep users, including DT, addicted to Defendants' video games.

16.     At all times material hereto, each Defendant targeted consumers/purchasers, including minors like DT, to (1) purchase and/or play its video games and (2) to purchase in-game items or perks in exchange for real money, known as "microtransactions," through in-game advertising and "fake" avatar friends. Each Defendant—with knowledge of DT's age—targeted DT and induced DT to enter into microtransactions.

17.     Upon information and belief, there may be individuals, corporations, or entities as yet unidentified to Plaintiffs who were engaged in the research, development, manufacture, design, testing, sale, marketing, and promotion of gaming devices, software, hardware, products and transactions---and who introduced such products into interstate commerce or marketed such products with knowledge and intent that such products be sold in the State of California – and who also may be liable for some or all of Plaintiffs' injuries and damages as described herein. Despite reasonable and diligent inquiries by Plaintiffs, the identity of said tortfeasor(s) has not been determined as of this date and, therefore, these potential tortfeasors cannot be identified as Respondents in discovery as permitted by Cal. Civ. Proc. Code § 2035.010, *et seq.*, and it is necessary to conduct discovery on Defendants in order to determine the identity of said tortfeasor(s). If a such a "John Doe" tortfeasor is identified for one or more causes of action, Plaintiffs will amend this Complaint in accordance with California law.

1

2                    **JURISDICTION AND VENUE**

3        18.    Plaintiff DT realleges and incorporates by reference all of the foregoing allegations as if

4   repeated in full here.

5        19.    This suit alleges causes of action seeking relief arising under the laws of the State of

6   California, including but not limited to the allegation that as a direct and proximate result of the

7   Defendants' Products and their negligent, deceptive, willful, immoral, reckless, and unlawful actions

8   and inactions, representations and misrepresentations, including by omission, Plaintiff DT suffered and

9   continues to suffer injuries and damages related to Defendants' activities in the State of California.

10        20.    This Court has personal jurisdiction over Defendant Roblox because this Defendant has

11   its principal place of business in San Mateo County, California and is "at home" in this State.

12        21.    This Court has personal jurisdiction over the remaining Defendants because they

13   routinely conducts business in California and have sufficient minimum contacts in California,

14   stemming from their activities whereby they have purposefully and intentionally availed themselves of

15   this jurisdiction and the benefits and protections of the laws of the State of California by marketing and

16   selling their video game Products and transacting business in the State of California. Further, the

17   controversy reflected in this action is directly affiliated with, related to, and arises from Defendant's

18   contacts with the State of California.

19        22.    Epic Games' registered agent for service of process is in California at CT Corporation

20   System, 330 N Brand Blvd., Glendale, California, 91203. Epic Games has not designated a principal

21   place of business in California; therefore venue is proper in any county.

22        23.    Microsoft's registered agent for service of process is in California at CSC – Lawyers

23   Incorporating Service, 2710 Gateway Oaks Drive, Sacramento, California, 95833. Microsoft has not

24   designated a principal place of business in California; therefore venue is proper in any county.

25        24.    Venue is proper in this County pursuant to Cal. Civ. Proc. Code § 395 because, among

26   other things: (a) Roblox is a resident of San Mateo County, California; (b) Epic Games and Microsoft

27   are foreign corporations with no designated California principal place of business, and therefore can be

28

sued in any county; and (c) each Defendant conducted substantial business in this County.

**GENERAL FACTUAL ALLEGATIONS**

25.    In 2023, 65% of Americans of all ages played video games every week.[4] In 2024, experts reported that roughly 85% of teenagers say they play video games, with 97% of boys and 73% of girls reporting video game usage.[5] Further, more than 90% of children older than two years old play video games, and "[c]hildren 8 to 17 years of age spend an average of 1.5 to 2 hours daily playing video games."[6] This research dramatically emphasizes the idea that video game usage has become fundamental in the life of an American child.

**I.    Extensive Video Game Usage Damages Adolescent Brains**

26.    For almost two decades, research on the interaction between video game usage and the adolescent brain has shown that extensive usage has a severe impact on the adolescent brain, including loss of grey matter, which leads to severe physical and mental effects on the child. Many of these effects are indicators or consequences of Internet Gaming Disorder ("IGD"), which is the addiction to video gaming.

27.    Research on the impacts of video game usage includes studies about the role dopamine plays in the brain during gameplay.

28.    Video games can and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by substance abuse or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between nerve cells in the brain, as well as between the brain and the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors, and particularly neurodivergent minors, whose brains are still developing.

---

[4] Crosby Armstrong, *Video Games Remain America's Favorite Pastime With More Than 212 Million Americans Playing Regularly*, Ent. Software Ass'n (Jul. 10, 2023), https://www.theesa.com/video-games-remain-americas-favorite-pastime-with-more-than-212-million-americans-playing-regularly/.
[5] Jeffrey Gottfried & Olivia Sidoti, *Teens and Video Games Today*, Pew Res. (May 9, 2024), https://www.pewresearch.org/internet/2024/05/09/teens-and-video-games-today/.
[6] Daniel Alanko, *The Health Effects of Video Games in Children and Adolescents*, Pediatr. Rev. (Jan. 1, 2023).

Increased dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

29.    The repetitive release of dopamine creates, reinforces, and strengthens a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the Products more and more, first at an increasing rate and then with compulsive desire until the impulse to use the Products develops into a disordered use or addiction.

30.    Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, mal and/or undernutrition, and other harmful effects, all to the severe detriment and damage to the minor, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers.

31.    Additional video game research reports the physical changes to the brain and brain matter as a result of gameplay.

32.    Research has shown that prolonged use of video games damages the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has also concluded that such use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

33.    Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

34.    Empirical studies indicate that gaming disorders are associated with detrimental health-

related outcomes.

35.     Brain imaging studies have shown that use of video games negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

36.     Other studies have shown that disordered and/or excessive use of video games leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

37.     The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 to 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals. The lack of full development of the prefrontal cortex is arguably why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes, minors are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which further impacts frontal lobe development.

38.     Brain imaging studies related to IGD have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies showed several regions of the brain demonstrated reduction in grey-matter volume in gaming disorder participants, as depicted here:[7]



---

[7] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder*, 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

39.     Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that engaging with video games activates regions of the brain in a manner similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

40.     Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain because of prolonged use of the Products. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are depicted in the following image:[8]



41.     Structural studies of the brain have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible because of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

42.     Research has shown that a neurodivergent minor with a diagnosis of Attention-Deficit Hyperactivity Disorder ("ADHD") or Autism Spectrum Disorder is at a higher risk of developing video game disorder or addiction, which can worsen one's ability to control impulsivity and result in brain damage.[9] Research has shown that while use of video games may foster creativity in some minors, such potential benefits are outweighed by the risk of developing addiction or disordered use of

---

[8] Aviv Weinstein et al., *Neurobiological Mechanisms Underlying Internet Gaming Disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

[9] Micah O. Mazurek & Christopher R. Engelhardt, Video Game Use in Boys with Autism Spectrum Disorder, ADHD, or Typical Development, 132 Am. Acad. of Ped. J.L. 2 (2013).

video gaming Products, which typically develops swiftly in minors and neurodivergent individuals.

This is particularly true when the Products incorporate addictive and manipulative tactics, as well as

other problematic psychological programing.

## II.    Gaming Addiction Is a Recognized and Diagnosable Condition

43.    Addiction to and disordered use of video games and internet gaming is a recognized,

diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric

Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[10] The diagnostic

symptoms of internet gaming disorder currently set forth in DSM-5 include: (1) Preoccupation with

playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or

other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3)

Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and

desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or

unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously

enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games

despite negative or problematic consequences; (7) Deceiving family members or others about the

amount of time spent playing and/or using video games; (8) Using video games to "escape" or relieve

negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or

relationships due to playing and/or using video games.

44.    Nationally recognized institutions such as the Cleveland Clinic and the National Center

for Biotechnology Information (NCBI) also recognize video game addiction and categorize the

addiction as falling under the general category of IGDs.[11]

45.    As of 2022, "Gaming disorder"—disordered use of and/or play with video gaming

Products—is a recognized mental health disorder by the World Health Organization and International

Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included

---

[10] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

[11] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).

within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[12]

"Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

### III.    Historical Development and Modernization of Video Games

46.    The term "video game" is defined by California Civil Code §§ 1746-1746.5 as "any electronic amusement device that utilizes a computer, microprocessor, or similar electronic circuitry and its own monitor, or is designed to be used with a television set or a computer monitor, that interacts with the user of the device."

47.    Video games were first developed in or around the 1950s.

48.    Initially, games were only available for play by the general public in arcades. Beginning in the 1970s, however, the first at-home video game devices ("consoles") appeared on the market.

49.    By the late 1990s and early 2000s, there were multiple at-home video game consoles, such as Xbox, PlayStation, and Nintendo's Wii, making video games easily accessible to most users from the comfort of their living room. Over the next ten years, video games moved to mobile devices and tablets, once again increasing accessibility to gameplay.

50.    Many video games – including Minecraft, Roblox, and Fortnite – can now be played on multiple different consoles, mobile devices, and tablets.

51.    Moreover, video games can be delivered to these consoles, mobile devices, and tablets in several diverse ways, such as physical discs, digital downloads, online gaming networks, and cloud gaming services.

52.    In 2024, there are 1.17 billion gamers online, and global gaming revenues are at least

---

[12] Other disorders found in that subcategory include alcoholism and gambling addiction.

1   $176.06 billion.[13]

2        53.    As the sophistication of gaming devices and game delivery methods has increased, so

3   too has the sophistication of the design of games themselves.

4        54.    Unlike their predecessors, many modern-day games are enormous in scale, providing

5   countless hours of non-repetitive, unique gameplay that allows players to become immersed in the

6   world of the game.

7        55.    The ways in which game developers monetize their games have also changed over time.

8   In the past, game developers earned revenue primarily through the one-time sale of their games.

9   Although some game developers still follow this model, others – including Defendants – allow their

10  games to be downloaded for no or minimal cost and generate revenue through purchases made within

11  the game.

12       54.    In-game purchases can include, but are not limited to, cosmetic customizations for the

13  player's character (e.g., hats, uniforms, hair styles), "boosters" that help their character perform better

14  or progress faster within the game, and "season passes" that allow players to access exclusive in- game

15  content.

16       55.    Many of these in-game purchases are relatively low cost, leading to them being termed

17  "microtransactions."

18       56.    In-game items available for purchase are often heavily advertised to players through

19  means such as in-game pop-up advertisements during gameplay, loading screens while users wait for

20  gameplay to start, and in-game stores.

21       57.    Many games also offer game-branded products such as toys, energy drinks, apparel,

22  bedding, home goods, board games, and more.

23       58.    Game developers that offer their games at no or low cost, such as Minecraft, Roblox,

24  and Fortnite, rely on these microtransactions to turn a profit. Indeed, the design and marketing strategy

25  associated with such games is rooted, in part, in the theory that the revenue from the on-going

26  microtransaction system will outweigh the revenue from a one-time-purchase game. That is because

27

28

---

[13] Jasmine Katatikarn, *Online Gaming Statistics and Facts: The Definitive Guide (2024)*, Acad. of Animated Art (Jan. 16, 2024), https://academyofanimatedart.com/gaming-statistics/.

microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user.

59.    Accordingly, modern gaming companies are enlisting Ph.D. behavioral psychologists and using research to implement programming into their games that will addict players with a goal of increasing the amount of time spent in game, thereby prolonging their exposure to in-game marketing for in-game purchases in order to improve the odds players will engage with micro-transactions that generate profits for the game developer.

## IV.    Psychological Techniques and Programming Choices Game Developers Use to Create Addiction, Drive Microtransactions, and Increase Profits.

### A.    Operant Conditioning

60.    Modern game developers, including Defendants, employ(ed) and/or consult(ed) with child development experts and/or psychologists to assist with the design and development of their games and/or gaming platforms, and to analyze the effects of game design on user behavior.

61.    Upon information and belief, modern game developers, including Defendants, knew that minors were engaging with their Products and utilized their child development experts and/or psychologists to design their games to attract and addict minors to their Products.

62.    Upon information and belief, the analyses performed by Defendants' behavioral experts and/or psychologists revealed that when video games that are programmed to incorporate "operant conditioning" that targets users' dopamine receptors, the operant conditioning triggers the users' desire to hyperfocus on using and overusing the Products.

63.    "Operant conditioning" is a form of behavioral manipulation that uses rewards and punishments to influence behavior. Through operant conditioning, rewarded behavior is likely to occur more frequently, while the frequency of punished behavior decreases.

64.    In the context of video games, video game developers including Defendants, relied upon these psychological analyses to program their games to employ operant conditioning in order to addict players and manipulate them into making profitable decisions for the game developers, such as spending more time playing their respective games and engaging in microtransactions.

**B.**     <u>Development and Use of Patented Programming</u>

65.     In addition to relying on their own studies to make programming decisions, game developers, including Defendants, developed, licensed, and otherwise utilized patented programming algorithms in their games that were intended to addict players, increase time spent in-game, and drive micro-transactions. By way of example:

a.   U.S. Patent No. 20160005270-A1, is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is used in Products, like Defendants' at issue here, and can be summarized as a "system and method … that drives microtransactions in multiplayer video games. The system may include a "microtransaction arrange match[] to influence game-related purchases. For instance, the system may match a more expert/marquee player with a junior player to encourage the junior player to make game-related purchases of items possessed/used by the marquee player. A junior player may wish to emulate the marquee player by obtaining weapons or other items used by the marquee player." The system for driving microtransactions is comprised of a host computer having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of the in- game item by the first player, wherein the matching is based on: (i) the relevance of the in-game item to the first player, and (ii) the possession of the in- game item by the second player. This system is further programmed to determine that the first player has purchased the in-game item in relation to the gameplay session; determine a subsequent gameplay session that caters to use of the in- game item; and match the

first player to play in the subsequent gameplay session to encourage future purchases.

b. U.S. Patent No. 9623335-B1 utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game," such as a virtual shop "present[ing] high-end, or expensive virtual items." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

c. U.S. Patent No. 9138639-B1 creates a dynamic pricing system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

d. U.S. Patent No. 9795886-B1 allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

e. U.S. Patent No. 9403093-B2 is a "dynamic" pricing patent that encourages users to make purchases on multiple game devices or platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating to play the game."

f. U.S. Patent No. 9626475-B1 creates an exclusive, time-limited, event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based

1    currency may become unusable by or unavailable to the users.

2    g.    U.S. Patent No. 9666026-B1 provides offers that "decrease in value based on

3          previous acceptances of the offers" in order to create a sense of urgency in relation

4          to the virtual items. Offers provided "may include a first offer having a first value

5          that progressively decreases based on an amount of users that have previously

6          accepted the first offer in order to incentivize early acceptance of the first offer."

7    h.    U.S. Patent No. 9808708-B1 adjusts "virtual item bundles made available to users

8          of an online game based on user gameplay information." This allows the game to

9          increase the price of an item bundle for a user with less cost sensitivity associated

10         with items that the user enjoys.

11    66.    Upon information and belief, many game developers, including each Defendant,

12   licenses one or more of the above technology patents, and/or other patents similar thereto, and

13   incorporate said technology into their respective video game Products with the intention of creating

14   addiction and profits.

15   **C.    Operant Conditioning, Patented Technology, and Game Design Choices Increase**

16   **Time Spent In-Game and Revenue Generated by Microtransactions.**

17    67.    Using operant conditioning and patented technology, video game developers, including

18   Defendants, analyze the skill level and behavior of the user and customize their experience to

19   maximize the time spent in-game, during which the user is bombarded with solicitations to purchase

20   additional in-game downloadable game content.

21    68.    In so doing, video game developers, including Defendants, exploit an information

22   asymmetry between themselves and the user. This allows game developers, including the Defendants,

23   to use their knowledge of the user's skill, game-related preferences, available funds, and/or playing

24   and spending habits to present in-game downloads and purchase offers that are predetermined to

25   maximize a user's expenditure of real money.

26    69.    For example, in some instances, video game developers, including Defendants, increase

27   the difficulty of the game as the player's skill increases, thereby increasing the amount of time it takes

28

for the player to achieve repeated success. During the extra time it now takes for the player to achieve success, the player is exposed to repetitive advertisements for desirable in-game items that can be obtained through points earned over time through continued and prolonged gameplay or instantaneously using in-game or real-world currency.

70. Likewise, game developers, including Defendants, may offer "season passes" in which players can pay real-world money to obtain access to exclusive items that are available to be purchased for a limited time through points earned during game play. Game developers incentivize players that have purchased "season passes" to engage in prolonged game sessions during the "season" to earn sufficient points to collect each exclusive item. Once again, however, by design game difficulty is dynamic resulting in players needing to play longer to obtain the results they desire, all while being exposed to advertisements for additional in-game products.

71. Critical to the Defendants' revenue, such continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for minor users to fail to understand the value of the actual money being spent which allows for more easeful and continuous spending of real money.

72. These and other schemes—all of which the Defendants knowingly incorporate into the design features of the Products—use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased spending by users, especially minors who are vulnerable to these tactics and which serve to deepen their disordered or addicted use.

## V.    Addictive Game Design Features Cause Significant Harm to Minors

73. The human population most vulnerable to the combination of game developers' microtransaction methodology and addictive operant conditioning design features are minors. Minors who are neurodivergent are even more susceptible to becoming addicted. Video game developers, including Defendants, know this, but nonetheless purposefully design(ed) their games to exploit that vulnerable population, causing injury and detriment, including to Plaintiff DT. Doing so has yielded the intended results: video game developers, including Defendants, have earned extraordinary financial revenue from this group of users as a result of placing their addictive Products targeted to minors into

the stream of commerce.

74.    The Defendants knew or were aware, or should have known and should have been aware, that their Products were and are dangerous and harmful to users, particularly minors, when used as intended and in a reasonably foreseeable manner. In fact, the Defendants intentionally cause(d) and design(ed) their Products to most effectively cause users with developing brains to become addicted or disordered in their desire to use the Products. To that end, upon information and belief, the Defendants employed behavioral psychologists and/or neuroscientists to develop Products that incorporate design features premised upon psychological tactics engineered to keep users engaged in using the Products for longer and longer periods of time.

75.    The microtransactions and other technologies, designs, features, mechanisms, algorithms, artificial systems, programs, and other processes the Defendants incorporated into the Products were implemented in a manner such that users (and, when users are minors, their caretakers) do not understand and have no way of understanding (or uncovering through reasonable diligence) that their use of the Products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the Defendants.

76.    There is no meaningful disclosure of the addictive mechanisms and microtransactions in the Defendants' Products at the time they are purchased to allow prospective users to make informed decisions as to whether using the Products is desirable, appropriate, safe, or worth the potential risk.

77.    At all times material hereto, the Defendants targeted consumers/purchasers, including minors and specifically including Plaintiff DT herein, to use the Products and engage via microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

78.    Each of the Defendants, with knowledge of Plaintiff DT's age and California residency, targeted DT with manipulative programming to prolong use of their Products in hopes of inducing them to engage in microtransactions during their use of the Products. As a result of DT's use of the Defendants' video game Products, and because of the addictive design features incorporated into the Products, DT was injured and damaged as herein alleged.

**VI.    Fortnite**

    **A.    <u>Fortnite Gameplay Basics</u>**

79.    Fortnite is an online video game and game platform designed, developed, and published by Defendant Epic Games.

80.    Fortnite is free to play, making it easily accessible to all users, including minors.

81.    Fortnite was first released in 2017 and is now available in three distinct game mode versions that share the same general design and engine.

82.    Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 users fight in a progressively shrinking arena to be the last person standing. Users can play alone, in a duo, or in a "squad" of 3-4 players. When users land "inside the game," the user must scavenge for weapons, items, resources, and vehicles while trying to stay alive, attack, and eliminate other users. Battle Royale is frequently Fortnite's most popular game and is the game mode to which many attribute Fortnite's success.[14]

83.    Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four users fight off zombie-like creatures and defend objects with traps and fortifications they can build. Users are awarded a number of in-game items from and during missions, including hero characters, weapon and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes. Save the World is the only pay-to-play game mode of the Fortnite franchise.

84.    Fortnite Creative is a sandbox game mode in which users are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

85.    Each of Epic Games' Fortnite products has similar graphics, art assets, and game mechanics.

86.    Fortnite has an average of 239 million monthly players and a peak of 15 million players

---

[14] The Week Staff, What is Fortnite and Why is it So Popular?, The Week, https://theweek.com/93700/fortnite-battle-royale-news (Aug. 3, 2018).

1   in a day.[15]

2       87.     Less than two years after Fortnite's release, the games had generated over $9 billion in

3   revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8

4   billion in revenue.[16]

5       88.     Fortnite game Products are monetized using V-Bucks: in-game currency that can be

6   purchased with real-world funds or earned through completing missions and other achievements in

7   Save the World.[17]

8       89.     Fortnite includes a feature called a "Battle Pass," which is the same feature as a "season

9   pass" as described above. Compl. ¶ 70. The Battle Pass in Fortnite allows players to earn various

10  rewards by "levelling up" the Pass. Levelling up can be done by earning medals during gameplay,

11  completing challenges, and purchasing the levels with V-Bucks.[18] V-Bucks are in-game currency that

12  can be purchased with real-world funds or earned through completing missions and other achievements

13  in Save the World.

14      90.     V-Bucks in Save the World can be used to buy loot boxes, in the form of llama-shaped

15  pinatas, to gain a "random" assortment of items.

16      91.     V-Bucks in Battle Royale can be used to buy cosmetic items like character models or

17  the game's battle pass: a tiered progression of customization rewards for gaining experience and

18  completing certain objectives during the course of a Battle Royale season.

19      92.     These features are only available if a user purchases a Battle Pass. The purpose of the

20  Battle Pass is to keep players engaged in hours of gameplay trying to earn rewards, and to increase

21  profits for Epic Games through the purchase of in-game content.

22

23  [15] This statistic is as of July 2023. *Fortnite Player Count: How Many People Play the Game?* The Econ. Times (Jul. 14,

24  2023), https://economictimes.indiatimes.com/news/international/us/fortnite-player-count-how-many-people-play-the-game/articleshow/101767141.cms?from=mdr.

    [16] This statistic is as of July 2023. Fortnite Player Count: How Many People Play the Game? The Econ. Times (Jul. 14,

25  2023), https://economictimes.indiatimes.com/news/international/us/fortnite- player-count-how-many-people-play-the-game/articleshow/101767141.cms?from=mdr.

26  [17] Sunil Gill, Fortnite Revenue, Player Count & Net Worth 2024, Priori Data (Apr. 1, 2024),
    https://prioridata.com/data/fortnite-statistics/.

27  [18] What is the Battle Pass? Where Can I Learn More?, Fortnite Support, https://www.epicgames.com/help/en-US/c-Category_Fortnite/c-Fortnite_Gameplay/what-is-the- battle-pass-where-can-i-learn-more-a000084706 (last visited Sept. 3,

28  2024).

1

2

      **B.**      **<u>Fortnite's Youth-Focused Partnerships Contradict Game Rating but Increase</u>**

      **<u>Profits</u>**

3        93.      Fortnite's Battle Royale and Save the World are rated T for Teen, i.e., recommended for

4   individuals aged 13 and above. This does not mean younger children cannot use them or that Epic

5   Games does not know that children under 13 are using Fortnite Products. Rather, Epic Games is aware

6   and markets Fortnite to consumers of all ages, and particularly to minors.

7        94.      Despite its T rating, survey results from 2019 show that 53% of U.S. children aged 10-

8   12 played Fortnite weekly, compared to 33% of U.S. teens aged 13-17.[19]

9        95.      Even though most Fortnite games are rated T, Fortnite (specifically Battle Royale) has

10   engaged in numerous collaborations with child-friendly entities such as Disney, LEGO, Marvel,

11   NERF, Air Jordan, DC Comics, PAC-MAN, the NFL, Ninja, Rocket League, Ghostbusters, Star Wars,

12   TRON, Neymar Jr., the NBA, LeBron James, Ariana Grande, Naruto, NaoDT Osaka, Indiana Jones,

13   Dragon Ball, Spiderman, Batman, TikTok, The Nightmare Before Christmas, Wreck-It Ralph, Lewis

14   Hamilton, Teenage Mutant Ninja Turtles, Nike, Pirates of the Caribbean, and more.[20]

15        96.      Most, if not all, of these collaborations are geared towards a wide audience that

16   unmistakably includes minors under the age of 13. Many young children watch Disney movies, play

17   with LEGOs, or listen to the music of pop stars like Ariana Grande. Epic Games is explicitly and

18   intentionally marketing its Fortnite games to young children by collaborating with the above entities.

19        97.      Not only does Epic Games engage in in-game collaborations, but they also have

20   physical merchandise they produce or sponsor, most of which are toys or children's items. For

21   example, Fortnite creates plastic toy loot boxes and battle boxes, action figures, NERF guns, trading

22   cards, board games, motorized toy cars, LEGO sets, and Halloween costumes. Fortnite has partnered

23   with children's toymakers like Hasbro to create some of these items.

24        98.      Epic Games knows that young children play Fortnite.

25

26   [19] National Research Group, Fortnite: The New Social Media? (June 4, 2019), available at
https://assets.ctfassets.net/0o6s67aqvvnu/5z4ja8fNx2NputEG49AVWs/ff1f591ad988f9a30856bab6

27   8e3908bb/NRG_Fortnite_White_Paper.pdf.
[20] Josh Taylor, Every Single Fortnite Collab & Crossover in Battle Royale's History, Dexerto (Aug. 26, 2024),

28   <u>https://www.dexerto.com/fortnite/every-fortnite-collab-crossover-battle-royale-history- 1645672/</u>.

99.     Epic Games organizes its advertisement and collaboration strategies around the interests of young children. And in 2024, Epic Games' projected annual revenue is $5.8 billion.[21] As a result of, in part, its partnership strategies, Epic Games will make a significant portion of that $5.8 billion from young children and their families, while its partnerships further encourage children under 13 to keep using its Products.

**C.     Fortnite was Designed with Intentionally Addictive Features**

100.    Epic Games designed Fortnite with numerous psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

101.    Epic Games actively employs or has employed psychologists and behavioral experts within its User Experiences department and Online department.[22]

102.    Upon information and belief, Epic Games designed Fortnite in conjunction with psychologists and other behavioral experts to ensure the addiction of minor and neurodivergent users.

103.    The use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, and other features described herein are all examples of Epic Games employing these psychological tactics.

104.    Epic Games failed to disclose that it designed the Fortnite Products with numerous psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse,

---

[21] Josh Howarth, Fortnite User and Growth Stats 2024, Exploding Topics (Jul. 22, 2024), https://explodingtopics.com/blog/fortnite-stats.
[22] See, e.g., Ben Taels, LINKEDIN, https://www.linkedin.com/in/ben-taels-06913a15 (last visited Sept. 4, 2024); Celia Hodent, LINKEDIN, https://www.linkedin.com/in/celiahodent (last visited Sept. 4, 2024); Video Games, Psychology, and the User Experience with Dr. Celia Hodent (Epic Games), NC State University Libraries, https://www.lib.ncsu.edu/events/video-games-psychology-and-user-experience-dr-celia-hodent-epic-games#:~:text=Video%20Games%2C%20Psychology%2C%20and%20the,Games)%20%7C%20N C%20State%20University%20Libraries (Feb. 2, 2016); Katelyn Procci, LINKEDIN, https://www.linkedin.com/in/katelynprocci (last visited Sept. 4, 2024).

addiction, and compulsive use by foreseeable users, i.e., minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the Products pose significant risk of harm.

105.    One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what topped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

106.    The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds. On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

107.    In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

108.    Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule"—the idea that randomized small wins will continue to draw in users.

109.    With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

110.    Additionally, the design of Fortnite keeps players drawn in. The bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

111.    Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more. In designing such mechanics, Epic Games ensures that players never once get bored while playing.

112.    To keep players even more engaged, Epic Games often rolls out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such

updates can also remove minor glitches that may be bothering the players as well. Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:



[23]

113.    Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

114.    These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

115.    Epic Games knew that its Fortnite Products contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Epic Games marketed Fortnite as "educational" and safe for use by minors (inside and outside the classroom).

116.    Epic Games misrepresented Fortnite as educational and safe for use by minors and neurodivergent individuals, including DT, while knowing that abuse, addiction, and compulsive use by such Product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible.

---

[23] https://fortnite.fandom.com/wiki/Quests_(Battle_Royale).

117.    Epic Games did not inform and concealed from the public, including Plaintiff DT, that Fortnite Products pose significant risks of harm to users due to Epic Games' decision to design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury in those individuals.

**D.      Fortnite Deceptively Promises Safety and Educational Value**

118.    Epic Games assures users that it wants its Product to be a "safe place for [users] to play games."[24]

119.    Despite assurances of safety, the addictive properties and design features, as alleged herein, of the Fortnite game Products are so dangerous to users, and especially minors, that several health and behavioral centers across the country have published resources for parents specifically warning about Fortnite addiction.[25] Many health experts have concluded that Fortnite is more addictive than heroin and other illegal drugs.[26]

120.    Despite these third-party warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into the Fortnite game Products.

121.    Although Fortnite features some parental controls in its Product, they are grossly deficient. While minor accounts are automatically created with some restrictions on communication and other features, there is no age verification process. If a minor who is under 13 wants to sign up with a fictitious birth date, they can, and can play Fortnite without the restrictions of an account where the user represents they are under 13.

122.    Fortnite could, but chooses not to, require express parental consent for minors under 13 to create an account. If a minor under 13 creates an account, they can still access most game content and purchase items.

123.    For example, while Fortnite can be played through Microsoft's Xbox Cloud Gaming, no subscription to Microsoft's Xbox Game Pass is required to play Fortnite. The games are free through

---

[24] Epic Games: Community Rules, Epic Games, https://www.epicgames.com/site/en- US/community-rules (last visited Nov. 26, 2024).
[25] Rachel Ehmke, A Parent's Guide to Dealing With Fortnite, Child Mind Institute, https://childmind.org/article/parents-guide-dealing-fortnite/ (last visited Aug. 26, 2024).
[26] Health Experts: Video Game "Fortnite" Can Be Addictive As Heroin, KRON ABC 8 News (Sep. 29, 2018), https://www.wric.com/news/whats-trending/health-experts-video-game-fortnite-can-be- addictive-as-heroin/.

the Xbox Cloud Gaming service:[27]



124.    Fortnite is also available for free on multiple other platforms, including Epic Games, Steam, and PlayStation.

125.    Fortnite imposes a daily spending limit on minors under 13, however, that limit is $100 per day.[28] A minor under 13 could spend $36,500 on Fortnite in a year without any parental consent or permission.

126.    Guardians can access parental controls to change the automatic restrictions set by Fortnite if their minor is under 13, however, Fortnite only allows a parent to adjust parental controls for any minor account through their minor's account. To engage with/change any parental control settings, the parent must first know that the account exists, and subsequently know the log in information of their minor.

127.    Fortnite does not provide parental controls regarding screen time, gameplay, and/or usage. Fortnite could, but chooses not to, allow parents to set time limits on their minor's Fortnite account. Fortnite also could, but does not, allow any users to set self-imposed time limits on their Fortnite account.

---

[27] https://www.fortnite.com/mobile/xbox-cloud-gaming.
[28] Daily Spending Limits For Players Under 13, Epic Games, https://www.epicgames.com/help/en- US/c-Category_EpicAccount/c-EpicAccounts_ParentalControls/daily-spending-limits-for-players- under-13-a000085524 (last visited Aug. 26, 2024).

128.     At account setup, Fortnite's website contains no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of Epic Games' Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

129.     During gameplay, there are no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of Epic Games' Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

130.     Epic Games designed and developed Fortnite games with the use of addictive operant conditioning to make users want to keep using the Products more and more.

131.     The team that developed Fortnite includes psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop Products that were addictive as possible.

132.     Upon information and belief, Epic Games has licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in Fortnite Products.

133.     Epic Games does not disclose to the public or the users of Fortnite any of the psychological tactics or addictive features it purposefully incorporates into its Products. Instead, Epic Games touts its Fortnite game Products as "educational" and markets them for use in the classroom.

134.     On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:[29]



---

[29] Education, Epic Games, https://dev.epicgames.com/documentation/en-us/fortnite- creative/education-in-fortnite-creative (last visited Aug. 26, 2024).

135.    Epic Games joined the Family Online Safety Institute ("FOSI") in 2023, stating they want to "support [FOSI's] work to keep kids safe online." Epic Games' Senior Director of Public Policy represents Epic Games wants to "be on the forefront of creating fun and safe games and experiences for people of all ages," emphasizing its alleged focus on the importance of safety for children playing its games, including Fortnite.[30]

136.    Engaging and addicting users who are minors early and in environments such as their classroom increases Epic Games's revenue through continued use of its Fortnite Products by young users, at the expense of these users' mental and physical health.

137.    Epic Games does not adequately inform, or inform at all, users of the inherent risks involved with using Fortnite game Products, specifically including that Fortnite was designed to addict users to their extreme harm and detriment.

## VII.    Minecraft

138.    Minecraft is a "sandbox game" in which players explore a blocky, procedurally generated, three-dimensional world with virtually infinite terrain.

139.    "Sandbox games" are those that do not constrain a player to achieving specific goals, and instead permit users a large degree of freedom to explore, interact with, or modify the game environment.

140.    Minecraft was developed by Mojang Studios and is published by Mojang Studios for Nintendo Switch and Android devices.

141.    Microsoft acquired Mojang Studios and the Minecraft intellectual property in 2014.

142.    Minecraft can be played on PC, various gaming consoles, and mobile devices.

143.    Minecraft has over 163 million monthly active players.

144.    Minecraft's revenue in 2021 was $380 million, from all different gaming platforms combined.

145.    In Minecraft, players can discover and extract raw materials, craft tools and items, and build structures and machines.

---

[30] Epic Games Joins the Family Online Safety Institute, FOSI (Nov. 28, 2023), https://www.fosi.org/about-press/epic-games-joins-the-family-online-safety-institute.

146.    Minecraft includes multiple game modes that include a survival mode, in which players must acquire resources to build in the world and maintain health, and a creative mode, in which players have unlimited resources and access to flight.

147.    Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world.

148.    The game world is virtually infinite and procedurally generated as players explore it.

149.    Accordingly, the game can be different each and every time a player logs in to play.

150.    When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard."

151.    Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play.

152.    Each player's main task in Minecraft is to survive all the problems using specific resources.

153.    When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling.

154.    Players with ADHD, especially, can become easily hyper focused and addicted to building worlds within the game.

155.    Minecraft multiplayer options also work to addict players to connecting with others in the Minecraft world.

156.    These versions also allow children to enter and engage with others in dangerous "chat room" features throughout the game.

157.    On certain devices, Minecraft pushes constant notifications about new features, skins for avatars, and new objects in the games. These notifications pop up on screen whether players are already playing Minecraft or not.

158.    These interactive features serve only to lure players to spend more time in the game.

159.    Once a player succeeds with one stage, they move on to the next one. Essentially,

1  Minecraft can last for eternity if the player is not strong-willed enough to stop playing.

2  160.    Mojang Studios was aware of and specifically developed their games along with

3  psychologists and neuroscientists to include such addictive psychological traits.

4  161.    Mojang Studios is aware that the more time a user plays the game, the more likely they

5  are to continue purchasing in-game content.

6  162.    Thus, at the expense of users' mental and physical well-being, Mojang Studios fails to

7  inform the public, users, or parents about the risk of addiction and other negative consequences that

8  can arise from gameplay.

9  163.    Instead, Mojang Studios tout the game as educational and market it to educators for use

10  in the classroom:[31]

11

12  

**GET MINECRAFT EDUCATION FOR YOUR CLASSROOM**

Engage students in game-based learning across the curriculum. Minecraft Education is a game-based platform that inspires creative, inclusive learning through play. Explore blocky words that unlock new ways to take on any subject or challenge. **Download Minecraft Education** to get started with a free demo.

18

19  164.    Mojang Studios even offers teachers ready-built lessons and curriculums centered

20  around their game:[32]

21

22  **RESOURCES**

Explore 500+ lessons, immersive worlds, challenges, and curriculum all at your fingertips.

**Learn More**

27  ─────────────────────
[31] https://education.minecraft.net/en-us
28  [32] https://education.minecraft.net/en-us

165.    Mojang Studios intends to introduce and addict as many users as possible in order to increase their own profits as these users continue playing—and spending—as they grow.

166.    Mojang Studios does not adequately inform users of the inherent risks involved with using and playing Minecraft or that the game was designed to addict and harm users.

## VIII.    Roblox

### A.    <u>Roblox Gameplay Basics</u>

167.    Roblox, developed and published by Roblox Corp., is an online "social gaming platform" and game creation system that allows users to program games and play games created by other users.

168.    Roblox was first released in 2006 but began to grow rapidly after 2015. This growth was accelerated by the Covid-19 pandemic.

169.    Roblox is free to play but offers in-game purchases available through a virtual called "Robux."

170.    Through Robux sales, Roblox generated $2.2 billion in revenue in 2022, a 16% increase from 2021; in 2021, Roblox increased its revenues by 107% of its 2020 revenues, which were themselves an 111% increase over 2019.

171.    Roblox currently has over 66 million daily active users and over 217 million monthly active users.

172.    Over half of Roblox users are under age 13.

173.    Roblox's goal is to "connect[] a billion people" with its game:[33]



---

[33] https://corp.roblox.com/

1

2      174.    To reach this goal, Roblox Corp. ensures that Roblox is easily accessible for users.

3      175.    It is currently available on nearly any device, including gaming consoles, computers,

4  and mobile devices:[34]



14      176.    At present, Roblox has 88.9 million daily active users[35] and over 217 million monthly

15  active users.

16      177.    More than 45% of the consumers playing Roblox are under age 13.[36]

17      178.    Roblox is an online game that is free to download and play, making it easily accessible

18  to all users, including minors.

19      179.    Individuals that wish to play Roblox must create a Roblox account.

20      180.    In order to create a Roblox account, individuals must include a birthdate, username, and

21  password.

22      181.    Users of any age can create a Roblox account, though users cannot enter a birthdate for

23  any year after 2019. There is no requirement to verify age upon sign-up, so users can represent that

24  they are younger or older than their actual age.

25      182.    Users are also not required to obtain parental consent to create a Roblox account nor to

26

[34] https://corp.roblox.com/

[35] Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Nov. 25, 2024).

[36] The Roblox User Base, Roblox Creator Hub, https://create.roblox.com/docs/production/roblox- user-base (last visited Aug. 23, 2024).

play Roblox.

183.    Roblox groups each game on its platform into four content-based categories: Minimal, Mild, Moderate, and Restricted. Once the user creates an account, the user can access almost all of Roblox's content if they represent they are over 8 years old. If a user is under 9 years old, they are only able to view Minimal and Mild content. If the user indicates they are between the ages of 9 and 17, the only content not accessible is content specifically marked as "Restricted", which requires ID verification to view.

184.    After creating an account, all users are assigned a default player avatar – a cartoonish character that represents the individual user within certain games. This avatar can be customized with different outfits and appearances through in-game purchases made in the in-game Roblox store using Robux.

185.    Robux can be obtained by (a) purchasing with real currency; (b) receiving a recurring stipend given to users with a Roblox Premium membership; and (c) earning from selling "game passes" or "developer Products" to other Roblox players.

186.    Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

187.    Roblox has hosted over 3.7 billion virtual transactions on its platform.[37]

188.    Roblox Corp. offers a Premium Membership option to users, which can be purchased with Robux. A Premium Membership offers users exclusive items and discounts, Premium-only levels within certain games, the ability to trade items with other users, and a stipend of Robux that defray the purchase cost of the Premium Membership.

189.    Roblox gameplay is unique and different from many "traditional" games. When an individual "plays" Roblox, they open the Roblox program, where they are presented with myriad games (known as "experiences") they can play.

190.    These games are sorted into different genres/categories, including but not limited to:

---

[37] Earning on Roblox, Roblox Creator Hub, https://create.roblox.com/docs/production/earning-on-roblox (last visited Aug. 23, 2024).

Sports, Role-Playing Games (RPG), Fighting, First Person Shooters (FPS), Horror, Comedy, Military, and Naval.

The games available to any particular user will vary based upon the age they entered when generating their account and Roblox's algorithm that recommends games to the user.

191.    While within the Roblox platform, players can jump back and forth between the games Roblox presents to each player.

192.    Most games available on the Roblox platform were not directly made by Roblox Corp. Rather, the Roblox platform includes a game design feature whereby users can generate their own games and make them available on the Roblox platform for others to play.

**B.    Roblox Corp.'s 2024 Changes to Safety Settings**

193.    In November of 2024, Roblox Corp. announced "major updates to [its] safety systems and parental controls."[38] It claimed these updates were implemented because "safety is and always has been foundation to everything [it does] at Roblox."[39]

194.    The changes Roblox Corp. made in 2024 included new labels for categories of content, changes to viewable content for each age group, parental controls for minors' screen time usage, and a new minimum age at sign up.

195.    Prior to the 2024 changes, Roblox Corp. allowed all users, regardless of age, to view any content other than that marked "17+" In fact, users as young as 2 or 3 could view any content on the platform that was not protected by age verification. Beginning in 2024, Roblox Corp. imposed stricter limits on the content viewable to users that represent they are younger than 9 years old. Even after these changes, however, users that represent they are older than 9 can still access all content not marked as "17+".

196.    Until 2024, Roblox Corp. did not provide parental controls for minors' screen time and usage on Roblox. Roblox Corp. could have allowed parent-imposed time limits, but instead chose not to allow parents to set time limits on their minor's Roblox account for over eighteen years of operation.

---

[38] Major Updates to Our Safety Systems and Parental Controls, Roblox Newsroom, https://corp.roblox.com/newsroom/2024/11/major-updates-to-our-safety-systems-and-parental- controls (last visited Nov. 25, 2024).
[39] *Id.*

1    197.    Until approximately September of 2024, Roblox Corp. allowed users to represent their

2    age as young as one year old and have access to virtually all content on the platform. Even now,

3    parents whose minors are over the age of 12 cannot set restrictions on spending limits, set time limits,

4    change privacy settings, or manage friends and communication on their minor's account.[40]

5    198.    The implementation of these restrictions and changes by Roblox Corp. in 2024

6    demonstrates its understanding of its responsibility to implement such restrictions and safety measures,

7    and further, demonstrates how easily Roblox Corp. can implement restrictions and safety measures in

8    general. These changes also demonstrate that Roblox Corp. has control over access to not only its

9    platform, but the games users are able to access on its platform. The changes that Roblox Corp.

10   implemented this year did not require game by game review by Roblox but instead were implemented

11   as system-wide updates.

12       **C.    Roblox's Monetization of Addictive Game Design**

13   199.    Roblox Corp. designed the game-creation aspect of its Product to allow users to create

14   their own Roblox video games for play and purchase by other Roblox users, including minors. Though

15   third parties create the games, Roblox Corp. profits from many of the games created on its platform.

16   200.    Roblox Corp. constructed a "Creator Hub" on its website. The Creator Hub provides

17   users with instructions (including "how-to" videos) from Roblox Corp. on how users can create their

18   own Roblox games and also provides users with tools that enable or facilitate creation of their own

19   Roblox games.

20   201.    Users that create their own games are referred to as "Creators" or "Developers."

21   202.    Roblox's website boasts that its top ten Developers made, on average, $30 million in the

22   second quarter of 2024.[41]

23   203.    Roblox Corp. reports its Developers collectively earned $1.4 billion from 2022-2023.[42]

24   204.    Roblox Corp. encourages creators to use the tools already available on its website to

25   craft its creator-made games. To assist in teaching current and potential Developers how to utilize their

26

27   [40] "17+" content is now known as "Restricted" content on Roblox.
     [41] *Id.*
28   [42] *Id.*

tools and Roblox Studio, the Roblox Corp.'s Creator Hub includes literature under topics such as: "Publishing," "Promotion," and "Monetization." The Creator Hub's purpose is to teach potential creators "everything [they] need to know about creating on Roblox."[43]

205.    The "Monetization" topic on the Creator Hub includes literature on monetization strategies, immersive ads, subscriptions, passes, developer Products, avatar items, engagement-based payouts, paid access, and private servers.[44]

206.    The Hub discusses "Engagement-Based Payouts," which lets the Developer "earn Robux based on the share of time that Premium members engage in an experience."[45]

207.    Roblox Corp.'s Creator Hub encourages Developers to keep other users playing their game(s) for as long as possible to increase the Developer's profits, and in turn, Roblox Corp.'s.

208.    The Creator Hub provides instructions on how Developers can access their "payout data," which will help the Developer "understand what factors drive Premium subscribers to [their] experiences."[46] Analytics on the website provide data and insight to grow a Developer's audience.[47]

209.    One of the tools featured on Roblox's Creator Hub is a "season pass." As described above, a season pass allows players to pay real-world money to obtain access to exclusive items that are available to be purchased for a limited time through points earned during game play. Compl. ¶ 70. Roblox's Creator Hub encourages the use of season passes to motivate players to continue playing Developers' games, create a sense of urgency regarding items offered for the season, and create anticipation for the next season to keep players coming back.[48]

210.    Roblox Corp. therefore encourages and gives step-by-step instructions for Developers to incorporate Roblox's harmful and addictive algorithms, programming, and strategies, including microtransactions and games without warnings or time restrictions, as described hereafter, into each of their games resulting in Roblox Corp. earning significant profits, up to 75%, from each game it helped

---

[43] Creation Overview, Roblox Creator Hub, https://create.roblox.com/docs/creation (last visited Aug. 23, 2024).
[44] Monetization, Roblox Creator Hub, https://create.roblox.com/docs/production/monetization (last visited Aug. 23, 2024.
[45] Products, Roblox Creator Hub, https://create.roblox.com/docs/production/monetization/engagement-based- payouts (last visited Dec. 2, 2024).
[46] *Id.*
[47] Roblox Creator Hub, https://create.roblox.com/ (last visited Dec. 2, 2024).
[48] Season Pass Design, Roblox Creator Hub. https://create.roblox.com/docs/production/game- design/season-pass-design (last visited Sept. 3, 2024).

design, host, and promote on its platform.

**D.** **Roblox Specifically Markets to Minors Yet Lacks Adequate Safety Features**

211.    Roblox Corp. does not adequately inform users of the inherent risks involved with using and playing Roblox or that the Product was designed to make users play more to their potential harm.

212.    Instead, Roblox Corp. provides users, potential users, and guardians false assurances of safety.[49] For example, Roblox Corp. states that:

    a.   it has "built a platform with safety at the foundation."[50]

    b.   it "spend[s] hundreds of millions of dollars each year to meet [its] safety mission."[51]

    c.   users should "learn about how Roblox's commitment to safety and civility helps students grow."[52]

    d.   its age recommendations for its Product are "grounded in child development research and informed by industry standards," essentially confirming its reliance on scientific research about adolescent development and content consumption.[53]

    e.   its recommendations are created by "examin[ing] global industry standards and consult[ing] child development experts"[54]; and

    f.   its Product is part of the "[n]ew era of teaching and learning," and teaches educators how to "pilot Roblox in [their] class or school district," assuring parents, educators, and students that its Product is safe for use of all ages.[55]

213.    While Roblox does feature some parental controls in its Product, almost all of these parental controls can only be applied to minors' accounts if the minor is under 13, despite Roblox Corp.'s alleged desire to create one of the safest online environments.

214.    None of Roblox's parental controls aside from content restrictions are required when a

---

[49] Matt Kaufman, CFO, Driving Civility and Safety for All Users, https://corp.roblox.com/newsroom/2024/07/driving-civility-and-safety-for-all-users (last visited Aug. 23, 2024).
[50] Education, Roblox, https://education.roblox.com/ (last visited Aug. 28, 2024).
[51] *Id.*
[52] *Id.*
[53] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en- us/articles/8863284850196-Allowed-Experiences-Controls (last visited Aug. 28, 2024).
[54] *Id.*
[55] Education, Roblox, https://education.roblox.com/ (last visited Aug. 28, 2024).

minor creates an account. A minor can easily create an account and bypass any parental controls if their guardian is unaware of the account or the ability to enable parental controls.

215.    Roblox Corp. states on its website that:[56]

> ▼ **First, get the go-ahead**
>
> If you're under 13 years old, please get permission from your parent or guardian to use Roblox. You shouldn't use our Services without their go-ahead.

216.    Despite its acknowledgement that users under 13 should not "use [its] services without their [guardian's] go-ahead," Roblox Corp. provides absolutely no safeguards or requirements of parental consent when making an account, even if that user represents they are under the age of 13. Further, this instruction regarding parental permission does not reasonably coexist with Roblox Corp.'s acknowledgement that its game was created for children.

217.    Roblox Corp. could, but chooses not to, require express parental consent for minors under 13 to create an account. Despite of its acknowledgement that minors should get permission from guardians before using its Product, Roblox Corp. fails to require parental consent.

218.    Additionally, Roblox Corp. only allows a parent to enable parental controls through their minor's account. To engage with/change any parental control settings or link a minor's account to theirs, the parent must first know that the account exists, and subsequently know the log in information of their minor.[57]

219.    Until 2024, Roblox Corp. did not provide parental controls for minors' screen time and usage on Roblox. Roblox Corp. could have allowed parent-imposed time limits, but instead chose not to allow parents to set time limits on their minor's Roblox account.

220.    Roblox Corp. could, but does not, allow any users to set self-imposed time limits on their Roblox account.

221.    Further, once a user reaches the age of 13, parents can no longer impose parental

---

[56] Roblox Support, Roblox, https://en.help.roblox.com/hc/en-us (last visited Aug. 28, 2024).
[57] Parents: How to Link Your Child's Account, Roblox, https://en.help.roblox.com/hc/en- us/articles/30428321333140-Parents-How-to-Link-Your-Child-s-Account (last visited Nov. 25, 2024).

1  controls on their minor's account.[58]

2      222.    The only Roblox content that is restricted without ID verification is "Restricted

3  content." Though Roblox Corp. has imposed content limits on users under the age of 9, a minor under

4  the age of 9 could easily create an account with a fictitious birth date representing they are over 8 and

5  access most of Roblox's games. Without age verification at account creation and/or to view specific

6  content, a minor under 9 can easily bypass Roblox's restrictions.

7      223.    At account setup, Roblox's website contains no warnings labels, banners, or messaging

8  informing minor users of the known risks and harms stemming from the use of Roblox Corp.'s

9  Product. Users are not provided with information regarding potential physical and mental harm

10  associated with gameplay.

11      224.    During gameplay, there are no warnings labels, banners, or messaging informing minor

12  users of the known risks and harms stemming from the use of Roblox Corp.'s Product. Users are not

13  provided with information regarding potential physical and mental harm associated with gameplay.

14      225.    Roblox Corp., while touting safety as a core value of its company, chooses not to

15  implement meaningful safety features, understanding that changes in parental controls and safety

16  features will reduce time spent in-game and, ultimately, revenue.

17      **E.**    **Roblox was Designed with Intentionally Placed, Addictive Features**

18      226.    Roblox Corp. knows that minors and those who are susceptible to addiction are using its

19  Product. Roblox Corp. knows its Product incorporates addictive designs that pose risks of causing

20  users to develop dangerous and disordered use and overuse of the Product. In fact, Roblox Corp.

21  developed addictive strategies, game designs, and monetization schemes and then instructed those

22  developing "experiences" for its platform to incorporate those addictive features into their games that

23  would be offered to minors. Nonetheless, Roblox Corp. chose to not inform the consuming public at

24  large, users, or parents of minors who are users, of such risks.

25      227.    Upon information and belief, Roblox Corp. designed Roblox and the addictive

26

27  [58] What Happens As I Get Older On Roblox?, Roblox Support, https://en.help.roblox.com/hc/en-
us/articles/30428367965460-What-happens-as-I-get-older-on-
Roblox#:~:text=In%20most%20regions%2C%20after%20a,limits%20will%20no%20longer%20ap ply. (last visited Nov.

28  25, 2024).

strategies, game designs, and monetization schemes offered in its game design studio in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

228.    Roblox Corp. admits to consulting child development experts for aspects of game development:[59]



229.    Roblox Corp. actively employs or has employed psychologists and behavioral experts within its People Science and Analytics department and User Experiences department.[60]

230.    The use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, and other features described herein are all examples of Roblox Corp. employing these psychological tactics.

231.    Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

232.    Roblox Corp. did not inform the public that it designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing

---

[59] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en- us/articles/8863284850196-Allowed-Experiences-Controls (last visited Aug. 28, 2024).

[60] See, e.g., Erica Snow, LINKEDIN, https://www.linkedin.com/in/erica-snow-phd-75272b39 (last visited Sept. 4, 2024); Philip Simmons, LINKEDIN, https://www.linkedin.com/in/philippsimmons (last visited Sept. 4, 2024); Carissa Kang, LINKEDIN, https://www.linkedin.com/in/carissakang (last visited Sept. 4, 2024).

that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury.

233.    Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injuries but concealed this information from the public and Product users, including Plaintiff MI.

234.    Roblox Corp. misrepresented Roblox as safe for use by minors and neurodivergent individuals, while knowing it had been designed and developed with addictive psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by minors can lead to injury, such that Roblox poses significant risk of harm to users.

235.    Roblox Corp. marketed Roblox as safe for all ages without warning of the addictive design and risk of injury associated with its video game Product and foreseeable use thereof, despite knowing that Roblox contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, and that have been experienced by minors, including MI.

## PLAINTIFF-SPECIFIC ALLEGATIONS

236.    DT is an 10-year-old minor who is addicted to video games; specifically, Fortnite, Minecraft, and Roblox.

237.    DT began playing Defendants' video games and using gaming Products when they were approximately 6 years old.

238.    DT began playing Minecraft and Fortnite at age 6 and quickly became addicted to gaming. Shortly after, he began playing Roblox at age 8, also becoming addicted to that game.

239.    Currently, DT is a ten (10) year old who now has no interest in any activities besides from playing Fortnite, Minecraft, and Roblox. DT becomes irritable when he does not have access to the Products including when he is at school. When DT is not playing the above referred to games, he is thinking about playing the games constantly. DT has lost friendships and has used money that was not his to purchase video games. DT has no ability to control nor decrease his usage of video games despite numerous attempts to do so. DT has experienced trouble in school, including a drop in grades,

as a result of his addiction.

240.    Each Defendant has engaged in deceptive, unfair, immoral, and reckless behavior that damaged and continues to harm Plaintiff DT and countless other children. For this, Defendants should be punished, and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

241.    DT never agreed to be harmed or exposed to an addictive Product. Plaintiff never entered into a contract with any of the Defendants, and/or to the extent that any Defendant claims DT attempted to accept an electronic terms and conditions clause by clicking buttons on a screen which included language Plaintiff did not understand, read, or language which was conscionable, and has been made void by virtue of its unconscionability and the power of disaffirmance. This unconscionability and disaffirmance is demonstrated and secured by the filing of this Complaint.

242.    Specifically, to the extent that any Defendant claims Plaintiff DT entered into a contract, any terms to which Plaintiff agreed are void and unenforceable. Each Defendant's terms of services or terms and conditions clauses is a contract of adhesion and has no variation or negotiable terms prior to the signing of parties. Further, Plaintiff, as a minor, lacked the capacity to contract, and thus expressly disaffirms any contract they may have made with any of the Defendants, or that Defendants may claim they made with DT who has not reached the age of majority, including but not limited to any arbitration agreements.

243.    Plaintiff DT's continued use of Defendants' Products, to the extent such use exists, is compulsive and due to DT's addiction to using the Products. Plaintiff's continued use does not serve as an affirmation of any potential contract between the Parties.

## **PLAINTIFF'S CLAIMS**

### **COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT**

#### **(Against All Defendants)**

244.    Plaintiff DT realleges and incorporates by reference each of the preceding paragraphs above as though set forth fully here.

245.    At all relevant times, each Defendant was engaged in the business of designing,

developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing the video game Products and platforms used by DT, which were and are defective and unreasonably dangerous as described above.

246. The video game Products that each Defendant placed into the stream of commerce were defectively designed. The Products were designed to cause addictive and compulsive use, including by minors. The Products are not reasonably fit, suitable, or safe for their intended purpose.

247. The defective conditions of Fortnite, Minecraft, and Roblox, at all times relevant herein have rendered them unreasonably dangerous and/or not reasonably safe. The foreseeable risks outweigh the benefits associated with Defendants' designs.

248. Each Defendant's respective designs were present in the Products when the Products left the hands of Defendants and when they were released to the general public to be used in an intended and foreseeable manner.

249. Fortnite, Minecraft, and Roblox, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the Complaint, including, but not limited to, the use of operant conditioning methodology in game design, the use of microtransactions in game design, the creation of Products that do not contain warnings about the potential physical, mental, emotional, and/or developmental harm resulting from use of the Products, the creation of Products without safeguards such as time restrictions on gameplay, the creation of Products without proper minor age verification, and because the Products created failed to operate as a reasonable user would expect.

250. Each Defendant designed its Products to be addictive and take advantage of the chemical reward system of users' brains to establish compulsive use and addiction.

251. Each Defendant's respective Products were expected to and did reach Plaintiff DT without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

252. DT used Defendants' Products, Fortnite, Minecraft, and Roblox, in an intended and

reasonably foreseeable manner, and the Products were not materially altered prior to their use.

253.    Each Defendant's respective defective Product was the direct and proximate cause of DT's injuries and harm that include, but are not limited to, emotional distress, diminished social interactions, lack of interest in other hobbies, developmental delays, withdrawal symptoms such as rage, anger, and physical outbursts for DT, and injuries and damages as a result.

254.    DT used Defendants' Products in their intended and reasonably foreseeable manner.

255.    Each Defendant knew or, by the exercise of reasonable care, should have known that minors, including DT, would use the Products without anyone inspecting the Products for addictive or other dangerous features.

256.    Reasonable users of Defendants' Products would not expect, and Plaintiff DT herein did not expect, that said Products would pose risks of severe physical, mental, and emotional harm.

257.    Reasonable users of Defendants' Products would not expect that Defendants knew about risks of severe physical, mental, and emotional harm and nevertheless chose to place their Products into the stream of commerce.

258.    Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing their respective Products without the harm-causing features listed above, while still providing an optimal gaming experience.

259.    At the time each Defendant's Products were designed, developed, distributed to DT, and played, safer alternative designs existed that were entirely feasible.

260.    Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize harm caused by their respective Products by implementing elements that include, but are not limited to:

      a.    Robust age verification;

      b.    Effective parental controls;

      c.    The removal of barriers to the enactment of parental controls;

      d.    Warnings of health effects of use and extended use upon sign-up;

      e.    Opt-in restrictions to the length and frequency of sessions;

f.  Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

g.  Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

h.  Limits for microtransactions; and

i.  Others as set forth herein.

261.    Instead, each Defendant designed Products that aggressively addict users with features that increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

262.    Plaintiff DT's injuries—physical, mental, emotional, and economic—were reasonably foreseeable to Defendants at the time of the Products' design, marketing, and operation.

263.    Plaintiff DT was injured as a direct and proximate result of each Defendant's placement of their respective Products into the stream of commerce, Plaintiff's use of the games as intended and designed, and the Products' defective design described herein. The defective designs of Fortnite, Minecraft, and Roblox were the proximate cause of Plaintiff's harm.

264.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff DT suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. DT's injuries are permanent and will require more medical care. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT II – STRICT PRODUCT LIABILITY – FAILURE TO WARN

### (Against All Defendants)

265.    Plaintiff DT realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

266.    At all relevant times, each Defendant designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and platforms that Plaintiff DT used.

267.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff DT would not have realized the potential risks of the Products. Fortnite, Minecraft, and Roblox are highly addictive and likely to cause physical, mental, and emotional injuries as listed above.

268.    Defendants knew, or should have known, that the use of Fortnite, Minecraft, and Roblox was dangerous, harmful, and injurious when used by Plaintiff DT in a reasonably foreseeable manner.

269.    Defendants knew that their Products are and were harmful, capable of causing and in fact were designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries.

270.    Defendants owed a duty to warn consumers of the foreseeable risks and dangers of the Products that the Defendants knew were present but not obvious or known to users, especially underage users, or their caregivers, or any average member of the consuming public.

271.    Upon information and belief, Defendants failed to include a warning or an instruction regarding the herein identified risks and dangers of using Defendants' Products, including risks posed to minors who use the Products, in their intended and foreseeable manner.

272.    None of each Defendant's respective Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk of harm and addiction to users, particularly minors.

273.    Defendants' Products did not contain a warning when the Products left their possession.

274.    Each Defendant breached their duty of care to provide timely and adequate warnings, instructions, and information, at least in the following circumstances:

      a.  failing to ensure the Products included warnings regarding their addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

      b.  failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

      c.  failing to include adequate and conspicuous warnings that would alert users to the

dangerous risks of the Products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

d.  failed to issue warnings to consumers regarding the dangerous risks of the Products even after the sale and/or download of their Products; and

e.  representing that the Products were and are safe for use, when in fact, the Defendants knew or should have known that said Products were designed to cause minors to overplay them until they developed an addiction or disordered compulsion to use the Products, and as such are and were unreasonably dangerous for use when operated as was foreseeable and intended by the Defendants.

275.    Moreover, each Defendant breached its respective duty of care owed to Plaintiff DT through their non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective Products. Those breaches include:

a.  utilizing information to design the Products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third-parties;

b.  failing to implement effective parental controls;

c.  failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequency or duration of use of Products, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d.  failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable Products and upgrades and in-game purchases and/or microtransactions; and

e.  failing to implement reasonably available means to allow users or their parents to limit or deter use of Products by minors during ordinary times for school or sleep.

276.     The failure of each Defendant to adequately warn about their defective Products created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the Products.

277.     A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff DT of the dangers.

278.     Had Plaintiff DT and/or Plaintiff's guardian received adequate warning about the risks of Defendants' Products, Plaintiff and/or Plaintiff's guardian would have heeded such warnings.

279.     Plaintiff DT was injured as a direct and proximate cause of each Defendant's failure to warn about their respective Products. Plaintiff would not have used the Products had they been aware that the Products could cause, among other things, stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, including an increased risk of suicidality.

280.     As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff DT suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. DT's injuries are permanent and will require more medical care and treatment in the future.

281.     Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT III – NELIGENCE – DESIGN

### (Against All Defendants)

282. Plaintiff DT realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

283. At all relevant times, the Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and platforms that Plaintiff DT used.

284. Defendants knew, or should have known, that the use of Fortnite, Minecraft, and Roblox was dangerous, harmful, and injurious when used by Plaintiff DT in a reasonably foreseeable manner.

285. Defendants knew, or should have known, that ordinary consumers such as Plaintiff DT would not have realized the potential risks and dangers of Fortnite, Minecraft, and Roblox. By design, Fortnite, Minecraft, and Roblox are highly addictive and likely to cause physical, mental, and emotional injuries as listed above.

286. Each Defendant owed a duty to all reasonably foreseeable users to design a safe Product.

287. Fortnite, Minecraft, and Roblox as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in this Complaint, including, but not limited to, the use of operant conditioning methodology in game design, the use of microtransactions in game design, the creation of Products that do not contain warnings about the potential physical, mental, emotional, and developmental harm resulting from use of the Products, the creation of Products without safeguards such as time restrictions on gameplay, the creation of Products without proper minor age verification, and because the Products created failed to operate as a reasonable user would expect.

288. Defendants breached their duty by failing to use reasonable care in the design of their Products by negligently designing Fortnite, Minecraft, and Roblox to specifically appeal to minors, who were particularly unable to appreciate the risks of the Products.

289. Defendants breached their duty by failing to use cost effective, reasonably feasible alternative designs that would make their Products less addictive and harmful to minors, including but not limited to:

    a.   Robust age verification;

    b.   Effective parental controls;

    c.   The removal of barriers to the enactment of parental controls;

    d.   Warnings of health effects of use and extended use upon sign-up;

e.  Opt-in restrictions to the length and frequency of sessions;

f.  Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

g.  Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

h.  Limits for microtransactions; and

i.  Others as set forth herein.

290.  Each Defendant breached their duty by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harm to users, especially youth. Instead, Defendants designed Products that aggressively addict users with features that increase addictiveness, use time, frequency of use, and engagement with the Products.

291.  A reasonable company under the same or similar circumstances would have designed a safer product.

292.  As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff DT suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. DT's injuries are permanent and will require more medical care and treatment in the future.

293.  Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT IV – NEGLIGENCE – FAILURE TO WARN

### (Against All Defendants)

294.  Plaintiff DT realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

295.  At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and

platforms that Plaintiff DT used.

296.    Defendants knew, or should have known, that the use of their Products was dangerous, harmful, and injurious when used by Plaintiff DT in a reasonably foreseeable manner.

297.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective Products posed risks of harm to youth. These risks were known and knowable considering each Defendants' own internal information and knowledge regarding its Products at the time of the Products' development, design, marketing, promotion, advertising, and distribution to DT.

298.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff DT would not have realized the potential risks and dangers of Defendants' Products. Fortnite, Minecraft, and Roblox are highly addictive and likely to cause physical, mental, and emotional injuries as listed above.

299.    None of Defendants' Products, as identified herein, contain a warning, nor have they ever contained a warning, that their Products pose an unreasonable risk of harm and addiction to users, particularly minors. Defendants' Products did not contain a warning when the Products left their possession.

300.    Had Plaintiff DT and/or Plaintiff's guardian received adequate warning about the risks of Defendants' Products, Plaintiff and/or Plaintiff's guardian would have heeded such warnings.

301.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its Product in a manner which the manufacturer should reasonably foresee.

302.    Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective Products cause addiction, compulsive use, and/or other physical, mental, emotional, and developmental delay injuries, including an increased risk of suicidality.

303.    A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

304.    As a direct and proximate result of Defendants' breach of duty to provide adequate

warnings, Plaintiff DT was harmed and sustained the injuries set forth herein.

305.    As a direct and proximate result of each Defendant's material misrepresentation and false statements, Plaintiff DT suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. DT's injuries are permanent and will require more medical care and treatment in the future

306.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff DT's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT V – NELIGENCE – ORDINARY

### (Against All Defendants)

307.    Plaintiff DT realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

308.    Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their Products, including DT.

309.    Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaging in activity culminating in placing their Products into the stream of commerce, owed a duty to exercise ordinary care in placing the Products into the stream of commerce.

310.    Defendants' duties include a duty to warn users of the hazards of using their Products, which Defendants knew were present in their Products, though such hazards were not obvious to users and particularly not so to minor users.

311.    Defendants' duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

312.    Each Defendant created harmful and addictive Products and failed to engage in the development of safer alternative games and/or platforms.

313.    For their own profit, each Defendant chose not to engage in the development of a safer alternative game and/or platform.

314.    Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

315.    Defendants' failure to act in developing a safer alternative game and/or platform constitutes a breach of their duty of reasonable care.

316.    Defendants knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

317.    Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their Products and in failing to warn users, and the parents of users who are minors, including DT, about how and when, if ever, to safely use their Products.

318.    Defendants were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, including DT, the tools to ensure that their Products are used in a limited and safe manner.

319.    As a result of Defendants' breach of the herein identified duties and resulting negligence, Plaintiff DT suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendants' Products.

320.    Defendants' breach of duty of care to Plaintiff DT was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

321.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff DT suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. DT's injuries are permanent and will require more medical care and treatment in the future.

322.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VI – STATUTORY NEGLIGENCE

### (Cal. Civ. Code § 1714)

### (Against All Defendants)

323.    Plaintiff DT realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

324.    Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their Products, including DT.

325.    Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaged in activity culminating in placing their Products into the stream of commerce, owed a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

326.    Defendants owed a duty to avoid engaging in conduct they knew, or reasonably should have known, would cause injury to their users, including Plaintiff DT.

327.    Each Defendant created harmful and addictive Products and failed to engage in the development of safer alternative games and/or platforms.

328.    For their own profit, each Defendant chose not to engage in the development of a safer alternative game and/or platform.

329.    Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

330.    Defendants' failure to act in developing a safer alternative game and/or platform constitutes a breach of their duty of reasonable care.

331.    Defendants knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

332.    Defendants were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, including DT, the tools to ensure that their Products are used in a limited and safe manner.

333.    As a result of Defendants' breach of the herein identified duties and resulting negligence, Plaintiff DT suffered severe physical, mental, and emotional harm, as well as economic damages, from Plaintiff's use of Defendants' Products.

334.    Defendants' breach of duty of care to Plaintiff DT was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

335.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff DT suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. DT's injuries are permanent and will require more medical care and treatment in the future.

336.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff DT's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VII – INTENTIONAL MISREPRESENTATION

### (Cal. Civ. Code § 1710(1))

### (Against All Defendants)

337.    Plaintiff DT realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

338.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and platforms that Plaintiff DT used.

339.    As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

340.    Defendant Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff DT.

341.    Defendant Epic Games designed Fortnite with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff DT.

342.    Defendant Mojang and Microsoft designed Minecraft with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff DT.

343.    Defendants knew of the risks associated with the use of their respective Products based on internal research and external studies known within the industry.

344.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

345.    Defendants knowingly and intentionally misrepresented that their Products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their Products, including Plaintiff DT.

346.    Defendant Roblox Corp. stated that it has "built a platform with safety at the foundation," that it has a "commitment to safety and civility," and that it consulted "child development experts" in creating recommendations for its Product.

347.    Defendant Epic Games stated that it wants its Product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms.

348.    Defendants Mojang Studios and Microsoft marketed Minecraft as "educational" and for use in the classroom despite knowing that its Minecraft games contained an inherent risk of abuse addiction, and compulsive use by youth and the harms that arise therefrom.

349.    Each Defendant intended for users, including Plaintiff DT, to rely on their representations that their respective Products were safe for use to keep users engaging with their

Products and increase their profits, and purposefully marketed their Products to minors for that reason.

350.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

351.    Defendants failed to disclose to users, including Plaintiff DT, that their Products are designed to create and sustain addiction.

352.    Defendants intentionally failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

353.    Defendants intentionally failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

354.    Defendants affirmatively represented that their Products were safe for use, particularly for minors, while they simultaneously knew that their Products caused addiction and compulsive use.

355.    Defendants intended for users, including Plaintiff DT, to rely on their representations that their Products were safe for use in order to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

356.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, Plaintiff's Guardian would not have allowed DT to use each Defendant's Products and Plaintiff DT would not have purchased, downloaded, played, continued to use, and/or purchased each Defendant's game content.

357.    Plaintiff DT was unaware of Defendants' intentional design and failure to warn about their addictive Products. Plaintiff reasonably relied on Defendants' representations that their Products were safe for use, particularly for minors.

358.    Plaintiff DT reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' Products.

359.    A reasonable person, including Plaintiff DT, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use

of Defendants' Products – to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff DT justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

360.    Because of Plaintiff DT's reasonable reliance on each Defendant's representations, Plaintiff sustained physical, psychological, and developmental harm, as well as damages.

361.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff DT suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. DT's injuries are permanent and will require more medical care and treatment in the future.

362.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff DT's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VIII – NEGLIGENT MISREPRESENTATION

### (Cal. Civ. Code § 1710(2))

### (Against All Defendants)

363.    Plaintiff DT realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

364.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the Products and platforms that Plaintiff DT used.

365.    As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

366.    Defendant Roblox Corp. designed Roblox with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation,

negative consequences on cognitive processes, and other harmful effects.

367.    Defendant Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

368.    Defendants Mojang Studios and Microsoft designed Minecraft with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

369.    Defendants knew of the risks associated with the use of their Products based on internal research and external studies known within the industry.

370.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

371.    Defendants knowingly and intentionally misrepresented that their Products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their Products, including Plaintiff DT, as described above.

372.    Each Defendant intended for users, including Plaintiff DT, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

373.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant made false statements about the safety of their respective Products.

374.    Defendants failed to disclose to users, including Plaintiff DT, that their Products are

designed to create and sustain addiction.

375.    Defendants failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

376.    Defendants failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

377.    Defendants affirmatively represented that their Products were safe for use, particularly for minors, while they simultaneously knew, or reasonably should have known, that their Products caused addiction and compulsive use.

378.    Defendants intended for users, including Plaintiff DT, to rely on their representations that their Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

379.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, Plaintiff's Guardian would not have allowed DT to use Defendants' Products and Plaintiff DT would not have purchased, downloaded, played, continued to use, and/or purchased Defendant's game content.

380.    Plaintiff DT was unaware of Defendants' intentional design and failure to warn about their addictive Products. Plaintiff relied on Defendants' representations that their Products were safe for use, particularly for minors.

381.    Plaintiff DT reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' Products.

382.    A reasonable person, including Plaintiff DT, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff DT justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

383.    Because of Plaintiff DT's reasonable reliance on each Defendant's representations,

Plaintiff sustained physical, psychological, and developmental harm, as well as damages.

384.    Defendants' misrepresentations were a substantial factor in causing harm to Plaintiff DT, who suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Thus, Plaintiff seeks actual damages according to proof.

## COUNT IX – FRAUD

### (Against All Defendants)

385.    Plaintiff DT realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

386.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and otherwise distributing the Products used by DT.

387.    As detailed herein, each Defendant knew about the defective conditions of its Products and that the Products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

388.    Each Defendant knew their Products posed risks to minors, like DT, based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like DT, to purchase/download the game and to continue using Defendants' Products and encourage the addiction knowingly caused by Defendants' Products.

389.    Defendant Roblox Corp. designed Roblox with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects

390.    Defendant Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation,

negative consequences on cognitive processes, and other harmful effects.

391.    Defendants Mojang Studios and Microsoft designed Minecraft with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

392.    Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

393.    Defendants knowingly and intentionally misrepresented that their Products were safe for use to further entice users to continue engaging with their Products, including Plaintiff DT.

394.    Each Defendant intended for users, including Plaintiff DT, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

395.    If Defendants had not concealed, omitted, and misrepresented facts regarding the safety of their Products, Plaintiff's Guardian would not have allowed DT to use Defendants' Products and would not have purchased, downloaded, played, continued to use, and/or purchased Defendants' game content.

396.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

397.    As a direct and proximate result of each Defendant's material omissions, Plaintiff DT had no reason to believe that each of Defendant's Products were unsafe for children to use.

398.    DT reasonably relied on Defendants' misrepresentations that each of their Products was safe for use.

399.     A reasonable person, including Plaintiff DT, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to use, or to continue to use, those Products. Thus, Plaintiff DT justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

400.     As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff DT suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. DT injuries are permanent and will require more medical care and treatment in the future.

401.     Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff DT's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT X – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code §§ 17200 et seq.)

### (Against All Defendants)

402.     Plaintiff DT realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

403.     Defendants are corporations, and thus each of them is a "person," as defined by California Business & Professions Code § 17201.

404.     California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, et seq., prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising."

405.     By the conduct described in detail above and incorporated herein, Defendants engaged in unfair and deceptive acts in violation of California's Unfair Competition Law.

406.     Defendants knowingly engaged in the production, design, distribution, and sale of

Products to users, including DT, which were unsafe and addictive, particularly for minors.

407.    Defendants promoted their Products to users, especially minor users, while concealing harmful information about the addictive and unsafe nature of said Products.

408.    These business practices that Defendants have engaged in are fraudulent and deceptive practices in violation of the UCL.

409.    Defendants' business practices are also unfair in violation of the UCL. Defendants' actions are unethical at minimum, and the benefit of employing their deceptive and addictive features does not, in any circumstance, outweigh the harm that Plaintiff DT suffered.

410.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described herein.

411.    As a direct result of Defendants' conduct, Plaintiff DT sustained economic losses, including over hundreds of dollars per year in video game related spending. Had Defendants not engaged in these fraudulent and deceptive practices, Plaintiff would not have sustained the aforementioned economic injuries.

412.    As a result of each Defendant's conduct, Plaintiff DT sustained significant injuries.

413.    As such, in accordance with the provisions of the California Business and Professions Code §§ 17200 and 17203, Plaintiff requests that this Court enjoin each Defendant from continuing to violate the UCL or violating it in the same fashion in the future, and from continuing to conduct business via the unfair and fraudulent business acts as set forth in this Complaint for the benefit of Plaintiff DT and the general public.

## **PRAYER**

WHEREFORE, Plaintiff Sumeka Chandler, as Guardian ad Litem and on behalf of DT, a minor, prays for judgment against each Defendant, as appropriate to each and every cause of action alleged and as appropriate to the particular standing of Plaintiff, as follows:

1.    For Plaintiff's general damages, including pain and suffering and emotional distress, according to proof at the time of trial;

2. For Plaintiff's past and future economic and special damages according to proof at the time of trial;

3. For Plaintiff's medical and related expenses according to proof at the time of trial;

4. For Plaintiff's prejudgment interest according to proof, pursuant to California Civil Code § 3291 at the time of trial;

5. For Plaintiff's costs of suit herein;

6. For injunctive relief;

7. For attorneys' fees;

8. For exemplary and/or punitive damages according to proof at the time of trial; and,

9. For such other and further relief, whether at law or in equity, to which this Court deems just and proper.

Dated:  August 4, 2025                **PARAFINCZUK WOLF, P.A.**

By: *John A. Bruegger*
John A. Bruegger, Esq. (SBN: 250494)
jbruegger@parawolf.com
5550 Glades Road, Suite 500
Boca Raton, FL 33431
Telephone: (954) 462-6700
Fax: (954) 462-6567

*Counsel for Plaintiffs*